UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| DAVID TENNENBAUM, Individually and on Behalf of All Others Similarly Situated, ) ) | No. |
| Plaintiff, ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. ) ) | CLASS ACTION |
| PURECYCLE TECHNOLOGIES, INC., MICHAEL OTWORTH, MICHAEL E. DEE, DAVID BRENNER and BYRON ROTH, ) ) ) ) | |
| Defendants. ) ) | DEMAND FOR JURY TRIAL |

Plaintiff David Tennenbaum ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the United States Securities and Exchange Commission ("SEC") filings by PureCycle Technologies, Inc. ("PureCycle"), along with its predecessor, Roth CH Acquisition I Co. ("ROCH") (PureCycle and ROCH are collectively referred to as "PureCycle" or "Company"), Company press releases, and media reports about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities fraud class action on behalf of all purchasers of the publicly traded securities of PureCycle and/or ROCH between November 16, 2020 and May 5, 2021, inclusive, and all holders of ROCH securities entitled to participate in the March 16, 2021 shareholder vote on the merger with PureCycle ("Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 ("1934 Act").

2.      Through November 2020, PureCycle's predecessor, ROCH, was a publicly traded special purpose acquisition company ("SPAC") formed in 2019 for the express purpose of effecting a merger, stock exchange, acquisition, reorganization, or similar business combination with one or more businesses.  As a SPAC in search of a business to acquire, ROCH had no ongoing business operations.

3.      Founded in April 2015, PureCycle provides recycling services.  The Company is developing a plastic purification recycling technology originally developed and patented by The Procter & Gamble Company ("P&G").  The Company claims its process recycles waste

polypropylene into resin with "near-virgin" characteristics.  The Company calls its resin ultra-pure recycled polypropylene ("UPRP"), and states that it can take used plastic feedstock and remove color, odor, and other contaminants, creating UPRP that has nearly identical properties and applicability for reuse as virgin polypropylene.  Through its global license with P&G, the Company claims to have the only patented, solvent-based purification recycling technology available for this process.  If the technology works, a royalty-based license is to be paid by PureCycle to P&G on a semi-annual basis.

4.      Polypropylene is used in a wide array of consumer facing and industrial products. PureCycle claims that global demand for polypropylene is growing, with 170 billion pounds needed annually – a number that is expected to reach 200 billion pounds by 2024.  The properties of polypropylene that provide desirable commercial benefits (such as strength, toughness, and elasticity) make it difficult to recycle.  PureCycle states that while polypropylene represents 28% of the world's polymer demand, only approximately 1% of polypropylene is recycled now, compared to 20% of polyethylene terephthalate, another common type of plastic.

5.      At the start of the Class Period, PureCycle was building its first commercial scale plant in Ironton, Ohio.  Production was expected to start there in late 2022, with 2023 listed as the full capacity date, and the Company stated that it planned to have five plants operational by 2023. PureCycle had just recently launched a $300 million bond and debt offering that it said would help finance the Company's first production plant in Ohio.

6.      The Class Period starts with the November 16, 2020 announcement that PureCycle would list its common stock on the NASDAQ through a reverse merger with the ROCH SPAC. At that time, the Company claimed that PureCycle was then modeling for its revenues to hit $8 million in 2022 as its first plant came on line.  Revenues would then ramp up significantly to $224 million in 2023 with the first five plants coming on line.  By 2024, PureCycle said it was modeling

to hit $800 million in revenues, with EBITDA margins of over 50%.[1]  The price of PureCycle common stock (then still trading as ROCH) spiraled up as the Company made additional statements about the merger, which its shareholders approved at a special meeting held virtually on March 16, 2021, and the resulting Company's combined business.

7.      Before the stock market opened on May 6, 2021, stock research firm Hindenburg Research published a detailed report ("Report"), supported by multiple former employees and industry experts, detailing that the management team bringing PureCycle public had: (a) previously brought six other businesses public only to have each implode thereafter, "resulting in 2 bankruptcies, 3 delistings, and 1 acquisition after a ~95% decline[,]" with "[o]ver $760 million in public shareholder capital [being] incinerated in the process"; (b) "based their financial projections" in those other failed companies on "'wild ass guessing,' [bringing] companies public far too early, and [having] deceived investors"; and (c) only brought PureCycle public in order to permit that same spurious management team to "collectively position[] themselves to clear ~$90 million in cash and tradable shares before the company generates a single dime in revenue."  The Report cited industry experts who explained that despite the Company's rosy projections, "PureCycle faces steep competition for high quality feedstock, and called the company's financial projections into question."  The Report included the account of a "30-year expert on polymers, with a background in advanced plastics recycling" who stated that PureCycle's "patent is 'indirect,' 'vague' and 'regurgitation' of prior art" and "referred to the company's flammable pressurized process as a 'bomb' and warned about the company foraging ahead to commercial scale despite still having issues at a lab scale."  The Report concludes that "PureCycle represents the worst qualities of the SPAC boom; another quintessential example of how executives and

---

[1]    "EBITDA" is earnings before interest, taxes, depreciation and amortization.

SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

8.      In response to this news, the price of PureCycle common stock price declined by more than 40%, or approximately $10 per share, on May 5, 2020, on very unusually high trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

9.      PureCycle's May 6, 2021 press release, issued in response to the Report, fails to challenge, much less negate, *any* of the Report's specific underlying factual allegations, merely stating, in pertinent part, that "[w]e remain confident in our people, our technology, and our long term growth strategy" and "[w]e believe PureCycle is well-positioned to continue executing on its strategy to drive long term growth and enhanced value for shareholders."

10.     As a result of Defendants' wrongful acts and omissions as alleged herein, Plaintiff and the Class (as defined below) purchased PureCycle and/or ROCH publicly traded securities at artificially inflated prices, suffered significant losses, and were damaged thereby when the artificial inflation was removed.

## JURISDICTION AND VENUE

11.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act, 15 U.S.C. §78aa.

13.     Venue is proper in this District pursuant to Section 27 of the 1934 Act and 28 U.S.C. §1391(b).  Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.

PureCycle's headquarters are located in this District at 5950 Hazeltine National Drive, Suite 650, Orlando, Florida 32822.

14.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the NASDAQ here in this District.

## PARTIES

15.     Plaintiff David Tennenbaum, as set forth in the accompanying certification which is incorporated herein by reference, purchased PureCycle common stock during the Class Period and suffered damages as a result of the securities fraud alleged herein.

16.     Defendant PureCycle Technologies, Inc. is headquartered in Orlando, Florida. Until March 17, 2021, the common stock of ROCH traded on the NASDAQ under the ticker symbol "ROCH," the warrants to purchase the common stock of ROCH traded on the NASDAQ under the ticker symbols "ROCHW," and the units comprised of ROCH common stock and warrants traded on the NASDAQ under the ticker symbol "ROCHU."  Following the March 16, 2021 shareholder approval of the merger and the March 17, 2021 closing of the merger, PureCycle common stock trades on the NASDAQ under the ticker symbol "PCT," the warrants to purchase its common stock trade on the NASDAQ under the ticker symbol "PTTW," and units comprised of PCT common stock and warrants trade on the NASDAQ under the ticker symbol "PCTTU." As of March 8, 2021, there were more than 9.8 million shares of ROCH common stock issued and outstanding.

17.     Defendant Michael Otworth ("Otworth") is, and at all relevant times has been, the Chief Executive Officer ("CEO") of PureCycle and has served as the Chairman of the combined company's Board of Directors since completion of the merger.

18.     Defendant Michael E. Dee ("Dee") is, and at all relevant times has been, the Chief Financial Officer ("CFO") of PureCycle.

19.     Defendant David Brenner ("Brenner") is, and at all relevant times has been, the Chief Commercial Officer ("CCO") of PureCycle.

20.     Defendant Byron Roth ("Roth") was, prior to the merger, the Chairman and CEO of ROCH.

21.     Defendants Otworth, Dee, Brenner, and Roth are sometimes referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of PureCycle securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of PureCycle's press releases, interim financial reports, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

22.     Defendant PureCycle and the Individual Defendants are sometimes referred to herein collectively as "Defendants."

23.     Defendants are liable for: (a) making false statements; or (b) failing to disclose adverse facts known to them about PureCycle.  Defendants' fraudulent scheme and course of

business that operated as a fraud or deceit on purchasers of PureCycle securities was a success, as it: (a) deceived the investing public regarding PureCycle's prospects and business; (b) artificially inflated the price of PureCycle securities; (c) permitted certain of PureCycle's senior executives and directors to collect $7 million in cash bonuses just for closing the SPAC deal, and set them up to receive an additional $40 million in compensation before any revenues are generated by the Company; (d) permitted the two investment banks who sponsored the ROCH SPAC, Roth Capital Partners, LLC ("Roth Capital") and Craig Hallum Capital Group LLC ("Craig-Hallum"), to collectively receive approximately 2 million "founders" shares for a little more than a penny per share, worth approximately $48 million the day before the Report was issued; and (e) caused Plaintiff and other members of the Class to purchase PureCycle and/or ROCH securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

24.     ROCH was a publicly traded SPAC incorporated in Delaware and formed for the purpose of entering into a merger, share exchange, asset acquisition, stock purchase, recapitalization, reorganization, or other similar business combination with one or more businesses or entities.  At its founding, ROCH stated that although it was not limited to a particular industry or geographic region for purposes of consummating an initial business combination, it intended to focus on businesses operating in the healthcare, wellness, consumer, or technology sectors.  After filing with the SEC an initial prospectus on Form S-1 in December 2019, and making several revisions in response to comments received from the SEC, the SEC declared ROCH's registration statement effective on May 4, 2020.  On or about May 5, 2020, ROCH issued and sold 7.5 million units made up of its common stock and warrants to purchase its common stock ("IPO").  Roth Capital and Craig-Hallum were the sole underwriters in the ROCH IPO.

25.     PureCycle is a six-year-old company based in Ironton, Ohio.  The Company seeks to commercialize a process for recycling polypropylene, a common plastic used in everything from carpets to shampoo caps to fishing nets.  Within the world of plastics recycling, polypropylene has been particularly uneconomical.  It represents 28% of the world's plastic, yet only approximately 0.8% of it is recycled today.  This is because a sizable amount of polypropylene requires expensive sorting and cleaning due to its use in food packaging.  It is also commonly found in products that use mixed plastics that can be difficult, if not impossible, to separate.  These dynamics have rendered polypropylene recycling largely uneconomical despite the world's top scientists and major chemical companies seeking a recycling solution since the discovery of polypropylene in 1951.

26.     Roth is the CEO and Chairman of Roth Capital, an investment bank based in Newport Beach, California that largely operates in the murky world of small cap and microcap banking.  Prior to taking on SPAC mergers like this one, Roth was well known for his role in facilitating numerous suspect reverse mergers involving Chinese companies, raising approximately $3.1 billion for China-based clients from 2003 to 2012.  Roth regularly took companies public then slapped glowing "Buy" ratings on the stocks through Roth Capital's own research division.

27.     Before PureCycle announced it was going public through the SPAC merger in November 2020, it was owned and controlled by Innventure, a Florida-based, startup incubator for "proven technologies."  Innventure was founded by Otworth and Brenner and PureCycle's Chief Science Officer and Director Dr. John Scott ("Scott").  Innventure's management team takes credit for what it characterizes as "six successful IPOs."  A closer look demonstrates that each of the "six successful IPOs" resulted in significant investors losses:

- **ChromaVision Medical Systems** ("ChromaVision") made imaging systems to detect cellular diseases. PureCycle's Scott served as Chairman of ChromaVision. ChromaVision amassed a $64.2 million accumulated deficit by end of year 2001 and received a notice of delisting in October 2004.

- **eMerge Interactive, Inc.** ("eMerge") was an online cattle auctioneer. PureCycle's Scott served as Chairman at eMerge, beginning in September 1994, before resigning in November 2001. eMerge amassed a $212.4 million accumulated deficit by end of year 2005, and filed for Chapter 11 bankruptcy and was delisted in 2007.

- **AgCert International, Ltd.** ("AgCert") focused on reducing emissions from pig dung. Bill Haskell, CEO of PureCycle's parent, Innventure, acted as "representative" for his group's investment in AgCert and also served as the company's interim CEO in 2005 through at least 2007. AgCert amassed a €141.1 million accumulated deficit by mid-2007. The company delisted after "misjudging its carbon credit portfolio" in 2008 and filed for insolvency in 2012.

- **TyraTech, Inc.** ("TyraTech") was focused on developing insect control products. Brenner served as founding CEO at TyraTech until 2009. TyraTech went public during his tenure and amassed a $55.5 million accumulated deficit by his departure. TyraTech was acquired in 2018 for just $2.15 million after declining approximately 95% from its highs.

- **PetroAlgae** claimed to have found a way to economically turn algae into fuel. PureCycle's Scott served as CEO of PetroAlgae. The zero-revenue company filed to go public in 2010. PetroAlgae amassed a $73.8 million accumulated deficit by 2010, and the company was delisted onto the OTC pink sheets by 2011. Scott resigned as Chairman in February 2012. The company changed its name in 2012 and ultimately had its securities registration revoked in 2017.

- **XL TechGroup, Inc.** ("XL TechGroup") was a venture capital/incubator company that preceded Innventure. PureCycle's Scott served as Co-Founder and CEO of XL TechGroup and Otworth held a C-level role at XL TechGroup. Bill Haskell, CEO of PureCycle's parent, Innventure, served as Co-Founder and President of XL TechGroup. The company went public in 2004, amassed a $189.6 million accumulated deficit, and its stock was delisted and cancelled in August 2008.

28.     PureCycle's technology is based on a license it obtained from P&G in October 2015. P&G invented and developed the technology underlying PureCycle's entire business because polypropylene was the largest plastic type used by P&G, and it has been notoriously

difficult to recycle.  The management team that took PureCycle public appears to have no background in polypropylene recycling.

29.     The Class Period starts on November 16, 2020, when PureCycle issued a press release before the opening of trading announcing that it would obtain a public stock listing by way of a reverse merger with then publicly traded SPAC ROCH.  The release stated, in pertinent part:

> PureCycle Technologies LLC holds the exclusive global license to commercialize the only patented solvent-based purification recycling technology for restoring waste polypropylene into virgin-like resin.  This process, developed by The Procter & Gamble Company ("P&G"), and ***commercialized*** by PureCycle, ***is both more cost-efficient and environmentally sustainable than the traditional manufacturing process of producing virgin polypropylene***, utilizing approximately 75% less energy.[2]  PureCycle's Ultra-Pure Recycled Polypropylene ("UPRP") has nearly identical properties and applicability for reuse as virgin polypropylene.  PureCycle intends to obtain a Letter of No Objection from the U.S. Food and Drug Administration for its UPRP to be used in food grade applications.
>
> ***Strong interest and broad global awareness of PureCycle*** has resulted in strategic investments and highly-attractive offtake agreements with notable groups including Aptar, BMW i Ventures, Closed Loop Partners, Glockner Enterprises, L'Oréal, Milliken & Company, P&G, Ravago, and Total.  ***As a result of this strong demand, PureCycle has contracted pricing for its UPRP that is both de-linked from commodity pricing and at a premium to virgin polypropylene resin.  Combined with abundant polypropylene waste feedstock, PureCycle expects to achieve EBITDA margins in excess of 50% from the Company's first seven plants in 2024.***

30.     The November 16, 2020 press release touted the Company's growth plans, including the buildout of its plants and their expected capacities, stating:

> The Company is building its first commercial-scale plant in Ironton, Ohio, ***which is expected to have nameplate capacity of approximately 107 million pounds per year when fully operational.  Production is expected to commence in late 2022 with full capacity expected to be achieved in 2023.***  PureCycle raised approximately $250 million in a tax-exempt municipal bond offering in October 2020 to fund the construction of the Ironton facility.  ***The Company has long term contracts for feedstock to supply the Ironton plant production and has entered***

---

[2]     "According to Company internal estimates; an independent Life Cycle Analysis (LCA) is planned to occur in 2021."

*into long term offtake agreements with leading global customers and Fortune 500 partners for all of the production of its UPRP from the Ironton facility.*

PureCycle intends to build new recycling production facilities globally, with the goal of having 30 commercial lines operational by 2030 and 50 by 2035.  In addition to PureCycle's first plant in Ironton, Ohio, *the Company expects to announce its next location in Europe and to commence production in 2023 with a nameplate capacity of approximately 107 million pounds when fully operational.  Additional expansion in the United States is expected to include five scaled up commercial lines capable of producing over 165 million pounds each of its UPRP.*  Pre-engineering for the design and installation of five commercial lines in a single "cluster" site is currently underway and *will result in a combined capacity of over 825 million pounds annually in one location.  Production from the Ironton, Europe, and cluster sites are expected to bring over 1.2 billion pounds of annual recycled polypropylene to the market in the next five years.*

31.     The November 16, 2020 press release also included quotes from Otworth regarding

the merger and the Company's business, stating:

This transaction represents a key milestone in PureCycle's mission to transform polypropylene into a recyclable and sustainable product.  *Our recycling process produces virgin-like resin that we believe is suitable for high-value, food-grade consumer products, and we believe we are well-positioned to meet the consumer demand for recycled content as well as global sustainability mandates.*  The proceeds of this transaction are intended to provide us with the balance sheet strength to accelerate the global rollout of *our proven technology* addressing the immense global problem associated with polypropylene waste.  The current global challenges surrounding polypropylene waste are significant.  Of the approximately 170 billion pounds of polypropylene waste produced annually, less than 1% is recycled today; the remainder largely ends up in landfills and the ocean, creating a massive environmental problem.  We look forward to partnering with the Roth CH team on an efficient, accelerated path for a successful public listing.

32.     Continuing, the November 16, 2020 press release quoted Roth, Chairman and CEO

of ROCH, as stating:

*We searched for a business combination that would not only be a compelling growth company but could also benefit from the relationships and experience of our two growth investment banks.  We believe PureCycle's technology will be transformative in plastic recycling and help companies meet their sustainability goals.*  We look forward to sharing additional details on this exciting transaction in the coming months.  We appreciate all of our shareholders and investors that have participated in the IPO and PIPE transactions.  We look forward to a successful future together.

33.     Finally, the November 16, 2020 press release touted the experience of PureCycle's management team, stating:

> PureCycle is retaining its ***experienced management team***, including CEO Mike Otworth, CCO David Brenner, and CFO Michael Dee. Mr. Otworth has over 23 years of experience leading and ***scaling early-stage companies***. Mr. Brenner was PureCycle's first hire and has led PureCycle's commercial expansion over the last four years. Mr. Dee spent nearly three decades in public markets, corporate finance, private equity and M&A in senior roles at Morgan Stanley, Temasek Holdings and the Asian Infrastructure Investment Bank.

34.     Defendants also provided a link to a webinar they produced about the benefits of PureCycle's business metrics and financial prospects, and filed a slide deck for that presentation with the SEC.  The slide presentation emphasized the purportedly experienced management team:



35.     The slide presentation also highlighted the purported value of the Company's technology and intellectual property rights, stating, in pertinent part:



36.    After detailing the construction and rollout of new factors, the slide presentation also provided strong financial guidance, stating, in pertinent part:



## Financial Projections

*($ in millions, except net revenue / lb)*

| | Projections | | | | | | | |
| | FY 2020P | FY 2021P | FY 2022P | FY 2023P | FY 2024P | FY 2025P | FY 2026P | FY 2027P |
|---|---|---|---|---|---|---|---|---|
| Operational Plants | - | - | 1 | 5 | 7 | 10 | 14 | 18 |
| Installed Capacity (mm lbs) | - | - | 119 | 853 | 1,219 | 1,769 | 2,503 | 3,236 |
| Effective Utilization (at 90% uptime) | - | - | 10% | 33% | 86% | 69% | 75% | 80% |
| Production (mm lbs) | - | - | 11 | 255 | 890 | 1,152 | 1,752 | 2,412 |
| Net Revenue | - | - | $8 | $224 | $820 | $1,077 | $1,659 | $2,325 |
| *Net Revenue / lb* | - | - | *$0.76* | *$0.88* | *$0.92* | *$0.94* | *$0.95* | *$0.96* |
| Feedstock Cost | - | - | 1 | 36 | 131 | 170 | 255 | 312 |
| Other Variable Costs | - | - | 3 | 52 | 170 | 222 | 342 | 477 |
| Labor | - | - | 1 | 12 | 31 | 39 | 59 | 81 |
| Plant Overhead | - | - | 0 | 2 | 5 | 6 | 10 | 13 |
| Gross Margin | - | - | $3 | $121 | $484 | $639 | $993 | $1,442 |
| *Gross Margin (%)* | *NM* | *NM* | *33%* | *54%* | *59%* | *59%* | *60%* | *62%* |
| Plant SG&A | - | - | 0 | 4 | 13 | 16 | 25 | 34 |
| Rent | - | - | 0 | 1 | 3 | 4 | 5 | 7 |
| Corp Expense | 3 | 10 | 14 | 16 | 18 | 19 | 20 | 21 |
| EBITDA | ($3) | ($10) | ($12) | $100 | $450 | $601 | $943 | $1,380 |
| *EBITDA Margin (%)* | *NM* | *NM* | *NM* | *45%* | *55%* | *56%* | *57%* | *59%* |
| D&A | - | - | 3 | 31 | 75 | 96 | 142 | 192 |
| EBIT | ($3) | ($10) | ($15) | $69 | $375 | $505 | $801 | $1,187 |
| Growth Capital Expenditures | $21 | $266 | $690 | $620 | $598 | $881 | $931 | $949 |
| Maintenance Capital Expenditures | $- | $- | $1 | $9 | $20 | $26 | $38 | $51 |

37. On November 16, 2020, Defendants filed a preliminary proxy statement with the SEC on Schedule 14A, which they amended on February 12, 2021, to schedule the virtual special meeting of shareholders on March 16, 2021. Like the November 16, 2020 press release, the proxy touted the strength of the Company's business, technology, management, and intellectual property rights, stating, in pertinent part:

> ***PCT's ground-breaking patented recycling process***, developed by Procter & Gamble and licensed to PCT, separates color, odor and contaminants from plastic waste feedstock ***to transform it into ultra-pure recycled polypropylene. PCT's recycling service converts waste plastic into near-virgin plastic, fully closing the loop on the reuse of recycled plastics while making recycled polypropylene more accessible at scale to companies desiring to use a sustainable, recycled resin.***

38. Describing the ROCH Board's reasons for approval of the business combination, the proxy stated:

> In particular, ROCH's Board considered the following positive factors, although not weighted or in any order of significance:

- **Strong Technology Representing Significant Innovation**: PCT's unique, ***patented process*** separates colors, odors and contaminants through a physical purification process (not involving chemical reactions), ***allowing for a broader range of feedstock than traditional recycling***. ***This purification process and resulting product quality have been tested and validated by P&G, prospective customers and third party engineering specialists.***

- ***PCT Secured Significant Investment by Lenders and Satisfied Bond Investor Due Diligence:*** PCT's Construction Indebtedness involve three levels of technology requirements:

  o Public report regarding ***independent evaluation of technology***;

  o ***Scaling risk quantification***; and

  o Infrastructure evaluation.

As well as meeting the following commercial requirements:

  o ***Proof of scale up***;

  o ***20+ year feedstock agreements***; and

  o ***20+ year offtake agreements***.

39. As with the Company's November 2020 press release, the proxy also touted the apparent strength of PureCycle's management team, stating:

- ***Strong Management Team:*** The ***PCT management team has broad experience across plastics manufacturing, plant development, technology, R&D***, sales, marketing, accounting and finance. PCT Chief Executive Officer Mike Otworth has over 23 years' experience ***leading and scaling early stage companies***, holding multiple senior management positions with a ***proven track record*** of founding and capitalizing startups. Chief Financial Officer Michael Dee was a senior executive at Morgan Stanley and has over 30 years of public markets, corporate finance, and M&A experience. Chief Science Officer John Scott holds a dual Ph.D. in Physics and Astrophysics, authored over 60 academic papers, and was the CEO of the XL TechGroup, the precursor company of Innventure. Chief Commercial Officer David Brenner brings over 15 years' ***experience leading transformational projects in a range of industries*** and was a Senior Manager at Deloitte prior to joining PCT. Director of Technology Jason Vititoe holds two product patents in polystyrene and decades of engineering leadership experience working for Americas Styrenics and Dow Chemical Company. Senior Director of Operations Chris Talarek has over 20 years of operations

- 15 -

leadership at BP Oil, P&G, and Timbertech. Combined, the PCT executive team has over 100 years' experience leading operations and over 70 years operating equipment.

40.     On March 16, 2021, shareholders approved the SPAC merger and related governance and financing terms by a large margin.

41.     The statements referenced above in ¶¶29-39 were materially false and misleading when made because they failed to disclose the following adverse facts which were known to Defendants or recklessly disregarded by them as follows:

(a)     that the management team bringing PureCycle public had previously brought six other failed business public only to have each implode thereafter;

(b)     that the management team bringing PureCycle public had characterized rank speculation as financial projections to investors in the past;

(c)     that the primary motivation of the management team bringing PureCycle public was to complete any transaction, good or bad, in order to obtain tens of millions of dollars in cash and tradable shares;

(d)     that PureCycle faces higher competition for high quality feedstock than it has led investors to believe, materially undermining the management team's financial projections;

(e)     that PureCycle's patent is nowhere as cogent or valuable as it has led investors to believe, and the technology underlying its business operations is unproven and presents serious issues even at lab scale;

(f)     that, in reality, the Company's flammable pressurized process is not yet functional, especially at scale, and is dangerous;

(g)     that the Company purports to be advancing to commercial production scale despite still having operational issues at a lab scale; and

- 16 -

(h)     that as a result of the foregoing, Defendants' positive statements during the Class Period about the Company's business performance, financial and operational metrics, and financial prospects were false and misleading and/or lacked a reasonable basis.

42.     Before the market opened on May 6, 2021, Hindenburg Research published the Report entitled, "PureCycle: The Latest Zero-Revenue ESG SPAC Charade, Sponsored By The Worst Of Wall Street."[3]  Among other things, the Report states:

(a)     PureCycle is the latest zero-revenue, ESG-themed SPAC taken public with a bold story about how it will someday revolutionize the plastics recycling industry;

(b)     the Company's insiders and SPAC sponsors collectively positioned themselves to clear approximately $90 million in cash and tradable shares before the Company generates any revenue; and

(c)     PureCycle's Chairman and CEO, and other associated executives, collectively took six companies public prior to PureCycle, and each failed, resulting in two bankruptcies, three delistings, and one acquisition after an approximate 95% decline, with more than $760 million in public shareholder capital incinerated in the process.

43.     The Report also added that:

- Multiple former employees of the earlier failed companies associated with PureCycle's executive team stated that PureCycle's executives *based their financial projections on "wild ass guessing," brought companies public far too early, and had deceived investors*;

- PureCycle executives have already begun to cash out, receiving $7 million in cash bonuses for simply closing the SPAC deal, and are slated to receive approximately $40 million in compensation before any revenue is generated;

- PureCycle's SPAC sponsors are two investment banks, Roth Capital and Craig Hallum Capital, who collectively received approximately 2

---

[3]   A true and correct copy of the Report is available online at: https://hindenburgresearch.com/purecycle/.

million "founders" shares for a little more than a penny per share, worth about $48 million at the May 5, 2021 share price;

- Roth has an odious reputation and is well-known for having brought numerous Chinese companies public on U.S. exchanges that later imploded after fraud allegations. Roth facilitated several of these IPOs, issued "buy" ratings on the companies through its research department, then left public investors holding the proverbial bag. Its activities earned the bank a prominent role in the documentary "The China Hustle";

- Roth and Craig Hallum are the only investment banks that have issued research on PureCycle. Both have "Buy" ratings with targets between $45-$48. Two partners in Craig Hallum's "research" division received founders shares for approximately one penny per share, including the company's Co-Director of Research;

- Unlike in traditional IPOs, where deal-runners must observe a "quiet period" before commenting publicly on a new issue, Craig Hallum's research department issued a "Buy" rating the very day of PureCycle's SPAC merger, sending shares surging;

- Many leading plastics companies publish peer reviewed studies that detail their advancements in the field. Contrary to that norm, the Report's authors could not find a single peer reviewed study in any scholarly journal citing or reviewing PureCycle's licensed process;

- Hindenburg Research spoke with multiple competitors and industry experts who explained that PureCycle faces steep competition for high quality feedstock, and called the Company's financial projections into question;

- Hindenburg Research consulted with a 30-year expert on polymers, with a background in advanced plastics recycling, who stated that the Company's patent is "indirect," "vague," and a "regurgitation" of prior art; and

- That same expert also referred to the Company's flammable pressurized process as a "bomb" and warned about the Company forging ahead to commercial scale despite still having issues at a lab scale.

44.    The Report concluded that PureCycle represents "the worst qualities of the SPAC boom; another quintessential example of how executives and SPAC sponsors enrich themselves while hoisting unproven technology and ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences."

45.     In response to this news, the price of PureCycle common stock price declined by more than 40%, or approximately $10 per share, on May 5, 2020, on very unusually high trading volume of nearly 11 million shares, or more than 16 times the average volume over the preceding ten trading days.

46.     As a result of Defendants' wrongful acts and omissions, Plaintiff and the Class purchased PureCycle publicly traded securities at artificially inflated prices, suffered significant losses when the artificial inflation was removed, and were damaged thereby.

ADDITIONAL SCIENTER ALLEGATIONS

47.     As alleged herein, PureCycle and the Individual Defendants acted with scienter in that they: knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth herein in detail, these Defendants, by virtue of their receipt of information reflecting the true facts regarding PureCycle, their control over and/or receipt and/or modification of PureCycle's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning PureCycle, participated in the fraudulent scheme alleged herein.

NO SAFE HARBOR

48.     The "Safe Harbor" warnings accompanying PureCycle's reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with generally accepted accounting

principles, including those filed with the SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.  *See* 15 U.S.C. §78u-5(b)(2)(A).

49.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of PureCycle who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## LOSS CAUSATION AND ECONOMIC LOSS

50.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of PureCycle publicly traded securities and operated as a fraud or deceit on purchasers of PureCycle publicly traded securities.  As detailed above, when the truth about PureCycle's misconduct was revealed, the value of PureCycle's publicly traded securities declined precipitously as the prior artificial inflation no longer propped up the price of the securities.  The decline in the price of PureCycle publicly traded securities was the direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline negates any inference that the losses suffered by Plaintiff and other members of the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiff and other Class members was a direct result of Defendants' fraudulent scheme to

artificially inflate the prices of PureCycle publicly traded securities and the subsequent significant decline in the value of PureCycle publicly traded securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

51.     At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Plaintiff and other Class members.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of PureCycle's business, operations, and financial results as alleged herein.  Throughout the Class Period, Defendants issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing the price of PureCycle publicly traded securities to be artificially inflated. Plaintiff and other Class members purchased PureCycle publicly traded securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

52.     Plaintiff and the Class are entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

53.     Plaintiff and the Class are also entitled to a presumption of reliance pursuant to *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the fraud-on-the-market doctrine because the market for PureCycle securities was an efficient market at all relevant times by virtue of the following factors, among others:

(a)     PureCycle securities met the requirements for listing and were listed and actively traded on NASDAQ, a highly efficient market;

(b)     PureCycle regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the

national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(c)     PureCycle was followed by securities analysts employed by brokerage firms who wrote reports which were distributed, publicly available, and entered the public marketplace.

54.     As a result of the foregoing, the market for PureCycle securities promptly incorporated current information regarding the Company from publicly available sources and reflected such information in the prices of the securities.  Under these circumstances, all those who transacted in PureCycle securities during the Class Period suffered similar injury through their transactions in PureCycle securities at artificially inflated prices and a presumption of reliance applies.

55.     Without knowledge of the misrepresented or omitted material facts, Plaintiff and other Class members purchased or acquired PureCycle securities between the time Defendants misrepresented and failed to disclose material facts and the time the true facts were disclosed. Accordingly, Plaintiff and other Class members relied, and are entitled to have relied, upon the integrity of the market prices for PureCycle securities, and are entitled to a presumption of reliance on Defendants' materially false and misleading statements and omissions during the Class Period.

## CLASS ACTION ALLEGATIONS

56.     Plaintiff brings this action on behalf of all purchasers of PureCycle and/or ROCH publicly traded securities during the Class Period, including all holders of ROCH common stock entitled to participate in the March 16, 2021 shareholder vote on the merger with PureCycle, who were damaged thereby ("Class").  Excluded from the Class are Defendants and their immediate families, the officers and directors of the Company and their immediate families, their legal

representatives, heirs, successors, or assigns, and any entity in which any of the Defendants have or had a controlling interest.

57.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, PureCycle and ROCH securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by PureCycle or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.  Upon information and belief, these shares are held by hundreds or thousands of individuals located geographically throughout the country.  Joinder would be highly impracticable.

58.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal laws complained of herein.

59.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

60.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

     (a)     whether Defendants violated the 1934 Act;

     (b)     whether Defendants omitted and/or misrepresented material facts;

(c)     whether Defendants acted knowingly or with deliberate recklessness in issuing false and misleading statements;

(d)     whether the prices of PureCycle and ROCH publicly traded securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(e)     whether the members of the Class have sustained damages and, if so, the proper measure of damages.

61.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5
Against All Defendants**

62.     Plaintiff incorporates ¶¶1-61 by reference.

63.     During the Class Period, Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

64.     Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)      made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of PureCycle and/or ROCH publicly traded securities during the Class Period.

65.      Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for PureCycle and/or ROCH publicly traded securities.  Plaintiff and the Class would not have purchased PureCycle and/or ROCH publicly traded securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

66.      As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of PureCycle and/or ROCH publicly traded securities during the Class Period.

**COUNT II**

**For Violation of Section 20(a) of the 1934 Act**
**Against All Defendants**

67.      Plaintiff incorporates ¶¶1-61 by reference.

68.      During the Class Period, Defendants acted as controlling persons of PureCycle within the meaning of Section 20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about PureCycle, the Individual Defendants had the power and ability to control the actions of PureCycle and its employees.   PureCycle controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.      Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 11, 2021                    ROBBINS GELLER RUDMAN
                                         & DOWD LLP
                                       JACK REISE
                                       ROBERT J. ROBBINS


                                                 /s/ Jack Reise
                                       JACK REISE
                                       120 East Palmetto Park Road, Suite 500
                                       Boca Raton, FL  33432
                                       Telephone: 561/750-3000
                                       561/750-3364 (fax)
                                       jreise@rgrdlaw.com
                                       rrobins@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
MARY K. BLASY
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

ADEMI LLP
GURI ADEMI
3620 East Layton Avenue
Cudahy, WI  53110
Telephone: 414/482-8000
414/482-8001 (fax)
gademi@ademilaw.com

*Attorneys for Plaintiff*

## PLAINTIFF'S CERTIFICATE

I, David Tennenbaum ("Plaintiff"), declare, as to the claims asserted under the Federal Securities laws, that:

1. Plaintiff has reviewed the complaint against **PureCycle Technologies, Inc.**, and certain other defendants, and authorizes its filing.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of a class, including acting as a Lead Plaintiff and providing testimony at deposition and trial, if necessary.

4. Plaintiff represents and warrants that s/he is fully authorized to enter into and execute this certification.

5. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as approved by the court.

6. In addition, Plaintiff has made no transaction(s) during the Class Period in the securities of **PureCycle Technologies, Inc.**, except as set forth in Exhibit A hereto.

7. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except if detailed as follows:

I declare under penalty of perjury, under the laws of the United States, this 7th day of May, 2021 that the information above is accurate.

David Tennenbaum

Drafted by:
Ademi & O'Reilly, LLP
3620 East Layton Ave.
Cudahy, WI 53110

EXHIBIT A

| Date | Purchases #Shares | Price |
|---|---|---|
| 3/18/21 | 500 | $34.32 |

| Date | Sales #Shares | Price |
|---|---|---|